## KEVIN DeWAYNE CARDWELL

## V.

## COMMONWEALTH OF VIRGINIA

Record Nos. 940345 and 940346

November 4, 1994

Present: All the Justices

Robert P. Geary (John F. McGarvey, on brief), for appellant.
John H. McLees, Jr., Assistant Attorney General (James S. Gilmore, III, Attorney General, on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

In these appeals, we review two capital murder convictions and a sentence of death imposed upon Kevin DeWayne Cardwell (Record No. 940345) and other related convictions (Record No. 940346).

## I

## PROCEEDINGS

In the first phase of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, Cardwell was found guilty of two charges of capital murder, *i.e.*, the willful, deliberate, and premeditated killing of Anthony Brown (1) in the commission of abduction with intent to extort money or pecuniary benefit, in violation of Code § 18.2-31(1), and (2) in the commission of robbery while armed with a deadly weapon, in violation of Code § 18.2-31(4). The jury also found Cardwell guilty of (1) abduction; (2) robbery; (3) using a firearm while committing murder; (4) using a firearm while committing abduction; and (5) using a firearm in the commission of robbery. The jury then fixed Cardwell's punishment at (1) life imprisonment for the abduction; (2) 20 years' imprisonment for the robbery; and (3) 10 years' imprisonment for the firearms charges. The jury also imposed a fine of $100,000 for the abduction.

In the second phase of the trial, the jury fixed Cardwell's punishment at death for capital murder, based upon the "vileness" predicate. Code § 19.2-264.2. After considering a post sentence report, prepared by a probation officer pursuant to Code § 19.2-264.5, the trial court sentenced Cardwell in accord with the jury verdicts.

Pursuant to Code § 17-110.1(F), we have consolidated the automatic review of Cardwell's death sentence with his appeal of the capital murder convictions. By order entered March 4, 1994, Cardwell's appeals of his other convictions were certified from the Court of Appeals, and we have consolidated those appeals with the capital murder appeal. Code § 17-116.06. We have given all the appeals priority on our docket. Code § 17-110.2.

## II

## THE CRIMES

On November 20, 1991, 15-year-old Anthony Brown travelled by bus from New York City to Richmond, ostensibly to visit Tina Poindexter. Poindexter told Cardwell that she was going to meet Brown at the bus station and that Brown would be carrying drugs. Cardwell related this information to his friends, Jermaine Jones, Richard Claiborne, and Craig Coles.

Shortly before the bus was to arrive, Poindexter drove her car to the bus station. Claiborne drove Cardwell, Coles, and Jones to the bus station in Coles' car. After Poindexter met Brown and the two got into Poindexter's car, Cardwell, Coles, and Jones got into the back seat of the car. While Coles held Brown, Cardwell, armed with both his inoperable .25 caliber pistol and Claiborne's operable .380 caliber automatic pistol, took Brown's duffle bag. The robbers also took Brown's shoes in order to make any flight difficult. They then fled to an apartment shared by Cardwell and Jones where Cardwell discovered that Brown's duffle bag contained no drugs.

A short time later, Cardwell received a telephone call from Poindexter, informing him that Brown had the drugs strapped to the inside of his thigh and that she was bringing Brown to the apartment. When Cardwell announced that he planned to rob Brown again and either knock him out or kill him, Jones and Coles wanted nothing to do with the plan and left the apartment.

Poindexter brought Brown to Cardwell's apartment on the pretext of helping Brown retrieve his duffle bag. Soon after their arrival, Cardwell threatened Brown with a pistol and demanded the drugs. Claiborne then pulled down Brown's pants and took the drugs that were strapped to Brown's thigh.

Cardwell, holding Brown at gunpoint, forced Brown to lie facedown on the floor of the back seat of Poindexter's car. Poindexter drove, Cardwell rode in the back seat, and Claiborne rode in the front, passenger seat. They intended to take Brown to Goochland County.

Brown repeatedly begged for his life, and Cardwell told him to "shut up." Poindexter realized that she did not have enough gasoline to drive to Goochland County, so Cardwell told her to drive behind a shopping center at the intersection of Patterson Avenue and Pump Road in Henrico County.

Once behind the shopping center, Cardwell demanded Claiborne's pistol. Claiborne believed that Cardwell intended to use the larger handgun to knock Brown unconscious. After obtaining Claiborne's pistol, Cardwell led Brown into woods behind the shopping center, and Claiborne followed.

From a distance of approximately 10 feet, Claiborne heard Brown beg, "Please don't kill me," and Cardwell say, "Shut up." Then Claiborne heard a "gargling noise" which he recognized "[f]rom the movies" as the sound of someone's throat being cut.

Cardwell told Claiborne, "I'm going to shoot him and he's going to die," and Claiborne said, "No." As Claiborne started back toward the car, he heard two gunshots, and, a minute or so later, Cardwell arrived at the car. Claiborne asked for the pistol, and Cardwell returned it.

Back at Cardwell's apartment, Cardwell asked for the gun in order to dispose of it. Claiborne unloaded the weapon so Cardwell could not use it against him and gave the pistol to Cardwell. Cardwell then put the pistol and a steak knife with a six-inch blade into a bag. Later, Cardwell threw the bag containing the pistol and knife into a dumpster at his apartment complex.

On January 26, 1992, Brown's decomposed body was discovered in the woods behind the shopping center. The body was identified by using dental records. It was determined, from the age of insects found on the body, that death had occurred in November 1991.

An autopsy revealed that Brown had sustained injuries in the throat area and on one wrist. Brown also had sustained two gunshot wounds to the back of the head, both of which passed through the right temple. Instantaneous unconsciousness and death would have resulted from either gunshot wound.

## III

## PRETRIAL MATTERS

### A

### *Constitutionality of the Death Penalty*

In a pretrial written motion, Cardwell asserted certain constitutional challenges to the death penalty statutes. The trial court rejected all the challenges, and Cardwell makes the same claims on appeal.

First, Cardwell claims that the death penalty statutes "on their face and as applied violate the Eighth Amendment prohibition against cruel and unusual punishment, the Sixth Amendment guarantee to a fair trial, and the Fourteenth Amendment guarantee that no person shall be deprived of life, liberty or property without due process of law." Next, he contends that the death penalty statutory scheme is unconstitutional because "it fails to guide the jury's discretion." Finally, Cardwell asserts that the death penalty statutory scheme is unconstitutional because "it denies [him] any meaningful appellate review."

Cardwell advances no arguments in support of these contentions, and concedes, as he must, that we have decided all these issues adverse to his position. For the reasons expressed in our prior decisions, we reject Cardwell's claims. *See, e.g., Stewart* v. *Commonwealth*, 245 Va. 222, 427 S.E.2d 394, *cert. denied*, 510 U.S. ____, 114 S.Ct. 143 (1993); *Yeatts* v. *Commonwealth*, 242 Va. 121, 410 S.E.2d 254 (1991), *cert. denied*, 503 U.S. ____, 112 S.Ct. 1500 (1992); *Quesinberry* v. *Commonwealth*, 241 Va. 364, 402 S.E.2d 218, *cert. denied*, 502 U.S. 834 (1991); *Stockton* v. *Commonwealth*, 241 Va. 192, 402 S.E.2d 196, *cert. denied*, 502 U.S. 902 (1991); *Spencer* v. *Commonwealth*, 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied*, 493 U.S. 1093 (1990); *Edmonds* v. *Commonwealth*, 229 Va. 303, 329 S.E.2d 807, *cert. denied*, 474 U.S. 975 (1985); *Briley* v. *Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980); *M. Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979).

## B

### *Denial of a Continuance*

Cardwell contends that the trial court committed reversible error in denying his second request for a continuance of the trial. Cardwell was indicted on May 10, 1993. Counsel was appointed to represent him on May 20, and, at that time and with the agreement of counsel, the trial was scheduled to commence on July 19, 1993.

On June 22, Cardwell filed a motion for a continuance. At a hearing on June 24, Cardwell's counsel represented that additional time was needed to prepare for trial and that a trial date in September 1993 would be preferable. The trial court granted the continuance, rescheduled the trial to commence on September 7, 1993, and reserved four days on its calendar for the trial. In granting the continuance, the judge informed counsel as follows:

I want to reemphasize to counsel that the Court fully expects to try the case commencing on September 7, therefore that any additional motions or if the defense . . . is not satisfied with the discovery, then I expect either party to bring those matters promptly to the Court's attention. I'm not going to

be waiting until the last minute to rule on motions of this nature.

On August 2, 1993, Cardwell requested the court to appoint Dr. Randy Thomas, a psychologist, to assist him in the penalty phase of the trial. The trial court appointed Dr. Thomas on August 3.

On August 23, 1993, Cardwell filed a motion for a second continuance of the trial. In the motion, Cardwell's counsel stated that, immediately after Dr. Thomas had been appointed, counsel "attempted to call [him] and discovered that he would be on vacation until August 25, 1993," and that, "[i]n order to properly examine [Cardwell,] Dr. Thomas will require about one to one and one-half months." No oral argument was presented in support of the motion, and, by order entered August 24, the trial court denied the continuance.

No further mention of a continuance was made to the court until September 9, 1993, at the commencement of the penalty phase of the trial. At that time, Cardwell's counsel represented to the court that Dr. Thomas had indicated to counsel

that what would be further necessary would be a possibility of a series of investigation[s] into a possibly seriously dysfunctional family background, the possibility of a serious drug and alcohol problem, and the possibility of a head injury with concomitant brain dysfunction or learning disability.[1]

The trial court again denied the motion, concluding that counsel had had adequate time to prepare for trial.

Whether to grant or deny a continuance of a trial is a matter that lies within the sound discretion of a trial court, and its ruling will not be reversed on appeal unless it is plainly wrong. *Lomax* v. *Commonwealth*, 228 Va. 168, 172, 319 S.E.2d 763, 765 (1984); *Parish* v. *Commonwealth*, 206 Va. 627, 631-32, 145 S.E.2d 192, 195 (1965). A court must exercise this discretion in a manner that does not prejudice a defendant's right to a fair and impartial trial or deprive him of his constitutional right "to call

---

[1] Counsel proffered for the record a document that counsel described as a confidential report from Dr. Thomas. The court read the report, sealed it, and marked it as "Defendant's Exhibit A." On appeal, Cardwell does not address the contents of the report, but we have read it, and the report contains the conclusions represented by counsel.

for evidence in his favor." Va. Const. art. I, § 8; *Lomax*, 228 Va. at 172, 319 S.E.2d at 765; *Gilchrist v. Commonwealth*, 227 Va. 540, 545-46, 317 S.E.2d 784, 787 (1984). A defendant's right to call for evidence in his favor guarantees him sufficient time to investigate and evaluate the evidence in preparation for trial. *Lomax*, 228 Va. at 172, 319 S.E.2d at 765. However, the need to investigate and evaluate the evidence and the prejudice allegedly resulting from the denial of a continuance cannot be based upon mere speculation. *Stewart v. Commonwealth*, 10 Va. App. 563, 569, 394 S.E.2d 509, 513 (1990). Thus, absent a showing of prejudice to a defendant by the denial of a continuance, an appellate court will not find that a trial court abused its discretion. *See, e.g., Thomas v. Commonwealth*, 244 Va. 1, 13, 419 S.E.2d 606, 612-13, *cert. denied*, 506 U.S. ___, 113 S.Ct. 421 (1992); *Quintana v. Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Rosenberger v. Commonwealth*, 159 Va. 953, 957, 166 S.E. 464, 465 (1932).

In the present case, Cardwell had been granted one continuance of nearly two months. At that time, the trial court admonished the parties that any further motions should be filed promptly. More than a month thereafter, Cardwell moved for the appointment of a psychologist, and the trial court entered the order of appointment the following day. The psychologist appointed had been requested by Cardwell; however, not until after the appointment did defense counsel inquire whether the psychologist would be able to examine Cardwell timely. Counsel then waited an additional three weeks before requesting the second continuance.

Additionally, defense counsel never followed through regarding Cardwell's examination by Dr. Thomas, although the trial court did not sentence Cardwell until November 10. Had the examination been performed, we might be in a position to say whether Cardwell's rights were prejudiced. As the record stands, however, we are left to mere speculation. Under the circumstances, therefore, we cannot say that the trial court abused its discretion in denying the second continuance.

## C

### *Refusal to Require Commonwealth to Elect One of the Two Capital Murder Charges Upon Which to Proceed*

Cardwell contends that the trial court erred in refusing to require the Commonwealth to elect to go forward on only one of the two charges of capital murder. He asserts, as he did at trial, that the two underlying offenses, *i.e.*, robbery while armed with a deadly weapon and abduction to extort a pecuniary benefit, conflict and that "the proof of the robbery would preclude the proof of the abduction." We do not agree.

■ Ordinarily, whether the Commonwealth should be required to elect is a matter that rests within the sound discretion of the trial court, and its decision will not be reversed on appeal absent a showing "that the rights of the accused may have been adversely affected." *Bryant* v. *Commonwealth*, 189 Va. 310, 315, 53 S.E.2d 54, 56 (1949). Accordingly, the Commonwealth may proceed on alternative indictments or counts "charging the commission of a single offense stated in different ways so as to meet the various phases of proof that might be offered." *Id*; *accord Buchanan* v. *Commonwealth*, 238 Va. 389, 397, 384 S.E.2d 757, 762 (1989), *cert. denied*, 493 U.S. 1063 (1990).

In the present case, Cardwell does not claim that his rights were adversely affected, and we conclude that they were not. Additionally, as stated in Part IV, A of this opinion, the two counts are not factually inconsistent or conflicting. Consequently, the Commonwealth was not required to make an election.

## IV

## GUILT PHASE

### A

### *Refusing to Strike the Commonwealth's Evidence Relating to Abduction for Pecuniary Benefit*

Cardwell contends that the trial court erred in refusing to strike the Commonwealth's evidence relating to the charge of capital murder committed during the course of abduction for pecuniary benefit, the abduction charge itself, and the related firearm charge. He argues that, because the drugs were taken at the apartment, there is no evidence "that the placing of the victim in

the car and taking him in the westerly direction was done for the purpose of extorting money or other pecuniary benefit." Cardwell further argues that "[w]hen the Commonwealth ended its case in chief, it still had a murder based upon a robbery. It did not have [a murder based upon] an abduction with intent to extort money or other pecuniary benefit."

A defendant may be convicted of abduction in addition to robbery if the victim's detention " 'is separate and apart from, and not merely incidental to, the restraint employed in the commission of [robbery].' " *Hoke* v. *Commonwealth*, 237 Va. 303, 311, 377 S.E.2d 595, 600 (quoting *Brown* v. *Commonwealth*, 230 Va. 310, 314, 337 S.E.2d 711, 714 (1985)), *cert. denied*, 491 U.S. 910 (1989). Thus, to constitute an abduction, separate and apart from a robbery, the victim's detention must be greater than the restraint that is intrinsic in a robbery. *Id.* at 311, 377 S.E.2d at 600. Additionally, an abduction committed for the purpose of avoiding an arrest for a robbery or to retain the fruits of a robbery is perpetrated with the intent to extort pecuniary benefit. *Cortner* v. *Commonwealth*, 222 Va. 557, 560-61, 281 S.E.2d 908, 910 (1981).

In the present case, the transporting of Brown from the robbery scene was a detention separate and apart from, and not merely incidental to, the robbery and was greater than the restraint intrinsic in a robbery. Further, the evidence clearly supports a finding that the abduction was committed to protect the fruits of the robbery and to escape an arrest. Therefore, the evidence supports the charge of an abduction with the intent to extort a pecuniary benefit. Consequently, the trial court did not err in refusing to strike the Commonwealth's evidence.

## B

*Refusal to Give a Cautionary Jury Instruction Regarding the Testimony of an Accomplice*

Cardwell contends that the trial court erred in refusing his proffered jury instruction which would have told the jury that the uncorroborated testimony of an accomplice should be considered with caution. Cardwell argues that the instruction should have been given because Claiborne was an accomplice and his testimony concerning the events at the murder scene was not corroborated. We do not agree.

■ The requested instruction should be granted only when the accomplice's testimony is uncorroborated. *Allard v. Commonwealth*, 218 Va. 988, 989, 243 S.E.2d 216, 217 (1978). The instruction need not be granted if the accomplice's testimony is corroborated "in material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony." *Dillard v. Commonwealth*, 216 Va. 820, 823, 224 S.E.2d 137, 140 (1976); *accord Clark v. Commonwealth*, 219 Va. 237, 242, 247 S.E.2d 376, 379 (1978). Additionally, an accomplice's testimony can be corroborated by an accused's admissions. *Russell v. Commonwealth*, 216 Va. 833, 837, 223 S.E.2d 877, 879-80 (1976).

■ In the present case, Claiborne's testimony was corroborated. The record is replete with Cardwell's admissions that he was not only the instigator of the crimes against Brown, but also the one who actually killed Brown, *i.e.*, the so-called "triggerman." Consequently, the trial court did not err in refusing the instruction.

## V

## PENALTY PHASE

### A

#### *Evidence*

In 1992, Cardwell was convicted in Lynchburg of possession of marijuana with intent to distribute. Cardwell told his probation officer that, at the age of 18, he had been convicted in Texas of trespassing. He also told his probation officer that, in the 11th grade, he had been expelled from school for fighting and that he quit night school in the 12th grade. Cardwell also admitted that he used different names, dates of birth, addresses, and social security numbers.

Cardwell's Lynchburg girlfriend testified that, during the time she had dated Cardwell, she never knew him to have a job. Cardwell, however, always had money from selling cocaine, which she had seen him sell. The girlfriend also testified that Cardwell would get intoxicated, become belligerent, and threaten people. On one occasion, Cardwell became upset after learning that a man had come to their residence to collect a debt he claimed Cardwell owed. Cardwell waved a gun around and, as he left,

fired the gun into the living room, occupied by his girlfriend and another.

On another occasion, Cardwell severely beat a man who had come to Cardwell's girlfriend's house asking for her. While others held the man, Cardwell struck him repeatedly, and he was taken by ambulance to a hospital. On yet another occasion, Cardwell encouraged a group of individuals to burglarize a Lynchburg grocery store, which Cardwell broke into by throwing a rock through a window.

A Richmond police officer testified about an incident when a young woman at a nightclub complained to him that Cardwell had been abusive and had threatened to kill her. The officer confronted Cardwell outside the nightclub and arrested him for public drunkenness. Cardwell became very violent, cursed the officer, and said, "I'm going to kill that bitch."

Another of Cardwell's former girlfriends testified that Cardwell had attacked her with a baseball bat. She also related that Cardwell told her of an incident when he shot in the foot a man who apparently owed Cardwell some money. The same woman also witnessed Cardwell beat a man with a beer bottle.

Cardwell's mitigation evidence consisted of the testimony of his grandmother, who had raised him. Cardwell had lived with her in Houston, Texas, until he was 18 years old. The grandmother was unaware that, while he lived with her, Cardwell had been in trouble with the law and expelled from school.

The grandmother told of how Cardwell's parents had neglected him. His father, a New York City resident, was "in and out of prison" and disregarded Cardwell throughout his childhood. Cardwell's mother subsequently married another man and lavished all her attention and affection on the son of this marriage and completely ignored Cardwell. According to the grandmother, this made Cardwell very sad and caused Cardwell to have nightmares.

## B

### *Jury Instruction Regarding Penalty*

Cardwell contends that the trial court erred in instructing the jury at the penalty phase of the trial. Specifically, he asserts that granted Instruction No. 1, standing alone, was incomplete and misleading. He further asserts that the court erred in refusing his proffered Instruction No. A.

Instruction No. 1 told the jury that it must decide whether Cardwell shall be sentenced to death or to imprisonment for life and that, before the penalty can be fixed at death, the Commonwealth must prove by evidence beyond a reasonable doubt either or both of the aggravating factors, *i.e.*, "vileness" or "future dangerousness." The instruction also told the jury that, if the death penalty is not justified, then Cardwell's punishment shall be fixed at life imprisonment. Finally, the instruction stated that, if the Commonwealth had failed to prove beyond a reasonable doubt at least one of the aggravating factors, then the jury should fix Cardwell's punishment at life imprisonment. Proffered Instruction No. A, which the court refused, would have told the jury that it was "not compelled to impose the death penalty even if [the jury] find[s] one or both of [the factors] proven beyond a reasonable doubt."

Cardwell claims that the instruction granted by the court did not make clear to the jury that it was free to fix punishment at life imprisonment even if it found either or both aggravating factors. We disagree.

In *Stewart* v. *Commonwealth*, 245 Va. 222, 244-45, 427 S.E.2d 394, 408-09, *cert. denied*, 510 U.S. ____, 114 S.Ct. 143 (1993), we held that the law as stated in instructions substantially similar to Instruction No. 1 adequately informed the jury that the death penalty was not mandatory even if both aggravating factors were proven by evidence beyond a reasonable doubt. We further held that the trial court did not err in refusing to grant an essentially duplicative instruction which was substantially similar to proffered Instruction No. A. *Id.* at 245, 427 S.E.2d at 409.

We adhere to our prior ruling and reject Cardwell's claim.

## C

### *Parole Eligibility*

Cardwell contends that the trial court erred in refusing his proffered Instruction B, which provided as follows:

Any person sentenced to life imprisonment on a conviction for capital murder, will not be eligible for parole for a period of twenty-five (25) years.

Cardwell argues that this information was necessary for the jury to decide between the death penalty and life imprisonment. He

asserts that failure to give the instruction deprived the jury of the opportunity to make a "reasoned moral response" to the evidence.

We consistently have held that information regarding parole eligibility is not relevant evidence for a jury's consideration. *See, e.g., Mueller v. Commonwealth*, 244 Va. 386, 409, 422 S.E.2d 380, 394 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1880 (1993); *King v. Commonwealth*, 243 Va. 353, 367-68, 416 S.E.2d 669, 677, *cert. denied*, 506 U.S. ____, 113 S.Ct. 417 (1992); *Eaton v. Commonwealth*, 240 Va. 236, 248-49, 397 S.E.2d 385, 392-93 (1990), *cert. denied*, 502 U.S. 824 (1991).

After the briefs were filed in the present case but before oral argument, the Supreme Court decided *Simmons v. South Carolina*, 512 U.S. ____, 114 S.Ct. 2187 (1994). *Simmons* holds that, in a capital case, when a defendant is ineligible for parole and his future dangerousness is at issue, a jury is entitled to be informed of his parole ineligibility. *Id.* at ____, 114 S.Ct. at 2198.

In the present case, the jury fixed Cardwell's punishment at death based upon the "vileness" predicate rather than upon the "future dangerousness" predicate. Therefore, the issue of the applicability of *Simmons* may be moot. However, assuming the issue is not moot, the holding in *Simmons* does not apply to the present case because Cardwell is not ineligible for parole. Therefore, adhering to our previous decisions, we conclude that the trial court did not err in refusing Instruction B.

### D

#### *Unadjudicated Criminal Conduct*

Cardwell contends the trial court erred in admitting into evidence in the penalty phase Cardwell's unadjudicated criminal conduct. In a number of our prior decisions, we have rejected this argument. *See, e.g., Stockton v. Commonwealth,* 241 Va. 192, 209-10, 402 S.E.2d 196, 206, *cert. denied*, 502 U.S. 902 (1991); *Spencer v. Commonwealth*, 238 Va. 295, 317, 384 S.E.2d 785, 798-99 (1989), *cert. denied*, 493 U.S. 1093 (1990); *O'Dell v. Commonwealth*, 234 Va. 672, 700, 364 S.E.2d 491, 507, *cert. denied*, 488 U.S. 871 (1988); *Gray v. Commonwealth*, 233 Va. 313, 346-47, 356 S.E.2d 157, 175-76, *cert. denied*, 484 U.S. 873

(1987). Adhering to those decisions, we conclude that the evidence was admissible.

## VI

## SENTENCE REVIEW

Code § 17-110.1 requires us to review Cardwell's death sentence on the record. In making the review, we must consider and determine the following:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

### A

### *Passion, Prejudice, or Other Arbitrary Factor*

■ Cardwell concedes that he cannot point to anything in the record that would suggest that the jury imposed the sentence under the influence of passion, prejudice, or any other arbitrary factor. Nevertheless, we have made an independent review of the record to determine if the jury did impose the death sentence under the influence of any arbitrary factor. We conclude that it did not. Moreover, the jury's finding of the "vileness" predicate is fully supported by the evidence.

### B

### *Proportionality*

■ In conducting the proportionality review, we must determine "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." *Jenkins v. Commonwealth*, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), *cert. denied*, 507 U.S. ___, 113 S.Ct. 1862 (1993); Code § 17-110.1(C)(2). To assist us in this review, we have compiled and examined the records of all capital murder cases reviewed by this Court, Code § 17-110.1(E), including those in which the defen-

dants received a life sentence. We have paid particular attention to those cases where, as here, the death sentence was based upon the "vileness" predicate. After conducting this review, we find that Cardwell's sentence of death is not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth. *See, e.g., Correll* v. *Commonwealth,* 232 Va. 454, 352 S.E.2d 352, *cert. denied,* 482 U.S. 931 (1987); *Wise* v. *Commonwealth,* 230 Va. 322, 337 S.E.2d 715 (1985), *cert. denied,* 475 U.S. 1112 (1986); *Boggs* v. *Commonwealth,* 229 Va. 501, 331 S.E.2d 407 (1985), *cert. denied,* 475 U.S. 1031 (1986); *Washington* v. *Commonwealth,* 228 Va. 535, 323 S.E.2d 577 (1984), *cert. denied,* 471 U.S. 1111 (1985).

## VII

## CONCLUSION

We find no reversible error in the trial court's judgments. From our sentence review pursuant to Code § 17-110.1, we conclude that the sentence of death should be affirmed. Accordingly, we will affirm the trial court's judgments.

Record No. 940345 — *Affirmed.*
Record No. 940346 — *Affirmed.*